## Case No. 17,766.

WILLINGS et al. v. CONSEQUA (three suits).

CONSEQUA v. WILLINGS et al. (two cases).

[Pet. C. C. 172.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1815.

SALE OF TEAS—INFERIORITY IN QUALITY—DAMAGES—HOW SETTLED—INTEREST.

1. The public sales of teas, in Holland, by the Asiatic Company, furnish evidence, but not conclusive, of the quality and value of teas disposed of at such sales; and the average price, brought by teas of the same quality and description, and not of that brought by all the teas of the same kind, affords this evidence.

2. Quære, if the usage in Canton is, that when teas are sold by samples, the examination and receipt of teas, delivered to a supercargo, after the samples have been furnished, discharges the Hong merchant from responsibility for quality. If this is the usage, the purchaser, in order to sustain a claim for damages, should prove that the teas furnished, are worse than the samples.

3. The rule of law, as to damages, is, that the sales of the plaintiff's teas, compared with those of similar teas, should be considered as ascertaining the rate of damages to be applied to the first cost of the teas in Canton. This rule is similar to that in case of insurance, where the rate of loss is ascertained from the prime cost of the articles lost.

[Cited in Youqua v. Nixon, Case No. 18,189; Cheongwo v. Jones, Id. 2,638.]

4. The adjustment of a claim for damages, in a particular case, upon other principles, does not exclude the Hong merchant from the benefit of the general rule; but such an adjustment may be opposed to the evidence of witnesses, to settle claims by damages on different principles.

5. It is generally in the discretion of the jury to give interest, in the name of damages.

6. Interest ought not to be allowed on unliquidated and contested claims, sounding in damages.·

[Cited in Barrow v. Reab, 9 How. (50 U. S.) 371; The Isaac Newton, Case No. 7,090.]
[Cited in Hinckley v. Beckwith, 13 Wis. 37.]

The jury were impanelled to try five actions; three brought by Willings and Francis, and Willings and Francis and Curwen, and Willings and Francis and Kuhn, against Consequa; and two by Consequa against Willings

[1] [Reported by Richard Peters, Jr., Esq.]

and Francis. In the latter suits there was no dispute. The other suits in which Consequa was defendant, were brought for breaches of parol agreements, made at Canton by Consequa; to deliver to the agents of these plaintiffs, cargoes of teas of certain denominations, and of the best qualities; one of the cargoes, viz. that shipped in the Bingham, to be suited to the Dutch markets. Two of the cargoes, viz. those of the Bingham and Ganges, were sold at Amsterdam by the Asiatic Company, at their public sales; and the third cargo, sent in the Asia, was sold in Philadelphia. To prove the inferior quality of the teas, or of some of them, which were sold at Amsterdam, the same kind of evidence was given, as in the case of Gilpins v. Consequa [Case No. 5,-452]. As to the cargo of the Asia, the evidence of persons acquainted with the teas, who examined them, was relied upon to prove their bad quality. Other evidence was given, upon which the points of law in this case arose, and which is stated, in the charge of the court.

WASHINGTON, Circuit Justice. The contracts upon which these suits are brought, have been fully proved; that they have not been fulfilled by Consequa, can hardly be denied. As to the cargo of the Asia, in addition to the acknowledgment of Consequa, that it was not of good quality; it was examined thoroughly, at Philadelphia, by unexceptionable judges, who have stated to you its quality and relative value, to other teas, then in market. As to the cargoes of the Bingham and Ganges, sold at Amsterdam by the Asiatic Company, at their public sales; it cannot be denied, that the prices at which those teas were sold, compared with the prices of other cargoes of good quality, sold at the same periods; furnish, at least, some evidence of their quality. It appears, that from the time of the arrival of a cargo of tea, in the Texel, it is taken under the care of the East India Company; is kept in their warehouses; samples of each chest are taken out and examined, and finally that those sales are attended by merchants, from different parts of Europe, amongst whom there are no doubt many competent judges of the article sold. It would seem reasonable therefore to conclude, generally, that the prices bid at those sales, for different parcels of teas of the same denomination, must bear some proportion to their quality; and consequently afford some evidence of that fact. In addition to this evidence, the jury have the testimony of a distinguished tea broker, who speaks very unfavourably of those teas, and considers them to be only of second or third quality.

But, although sales at auction may, in general, afford some evidence of the comparative value of the article sold, still as a standard of quality, they may not always be satisfactory, much less conclusive. The prices bid, may frequently depend upon the state of the market, or the age of the teas, either positively or relatively, to other teas, sold at the same time, of superior quality and fresher. In forming their opinion of the disproportion between the plaintiffs' teas, and the best teas of similar denominations, sold at the same time; it will be proper for the jury to take all these circumstances into consideration, and, after duly weighing them, to fix the standard, by which the qualities of the teas delivered by the defendant to the plaintiffs ought to be estimated. This may be either the average of the highest prices, or something below it, as the jury may think just. If teas originally of good quality, do not injure by being kept as long as those were in the warehouses of the Asiatic Company then that circumstance will not merit their regard. One thing will be recollected, which is, that in comparing these teas with others of like denominations, sold at the same time; the average of the highest prices of these teas, or of such as do not greatly vary from each other, should be taken; except, so far as may be thought necessary to fix upon a lower sum, from the considerations before mentioned. The reason of this is, that if the average of the various prices bid for these teas, is taken; in comparing the plaintiffs' teas, which, by the contract, ought to have been of the first quality, with teas confessedly inferior, so far as the inferior teas composed the quantity from which the average is taken, and such must necessarily have formed a part of the quantity; it would not be a test of quality.

The next question is, whether the plaintiffs, by the conduct of their agents, dispensed with a strict performance of these contracts, on the part of Consequa. It is contended by the counsel for Consequa, that those agents, instead of relying upon their contracts, selected teas as their own judgment dictated, after trying the different samples sent to them: and that by the usages at Canton, the Hong merchant is, in such cases, only bound to provide a cargo, corresponding with the samples so approved of by the purchaser. This usage is attempted to be proved by the testimony of three American gentlemen, who have resided at different periods at Canton; and, if they are correct, it would follow, that whenever the purchase is made by samples, the purchaser, to maintain his action against the Hong merchant, must prove that the cargo was of an inferior quality to the selected samples. But, if the usage be as stated by these witnesses, it is difficult to account for the settlement made by Consequa in relation to the cargo of the Ganges; samples of which, were examined and approved of by the supercargo of that vessel. In this settlement, he gave up nearly nineteen thousand dollars, which the plaintiffs had no right to claim from him, according to the alleged usage. May not this conduct of Consequa, be considered as evidence of the usage upon this point, equal if not superior, to that of the witnesses who have testified respecting it? No man ought to be better informed than Consequa, in relation to the usage, in a case so frequently occurring in

the particular business in which he was engaged. If the jury should consider the subject in this light, and that it is better evidence of the usage, than that given by the three witnesses; then the circumstance of the plaintiffs' agents having purchased by samples, ought not to operate against the plaintiffs. But if, on the other hand, they are of opinion, that Consequa's conduct amounted to nothing more than a waiver of a legal right, in that particular case; then it cannot affect his rights in any other case, and the rule of law, which has been stated, must apply. It is however to be recollected, that that rule, however well established, does not apply to the cargoes of the Bingham or of the Asia, both of which were taken, exclusively, upon the judgment and selection of Consequa.

The last question is, what ought to be the rule by which the damages for the breaches of those contracts should be assessed? The rule laid down in the case of Gilpins v. Consequa, was, that the sales at Amsterdam of the plaintiffs' teas, compared with those of other teas of similar denominations, were to be considered as furnishing, not the amount of damages sustained by the plaintiffs, but the rate of the damages, to be applied to the first cost at Canton. Thus, if the difference between those sales was 20 or 50 per cent., to the disadvantage of the plaintiffs' teas, Consequa would have to pay, after that rate, as applied to the first cost at Canton. With this rule the court finds no cause to be dissatisfied; the reason of it is obvious. The contract is, to deliver teas of the best quality at Canton. If it be not complied with, the price of such teas, at that place, is the just measure of the damage sustained by the plaintiffs. For the seller has nothing to do with the foreign market, to which the article may be sent: he has no control over the property or its destination; and receives no premium or compensation whatever, to induce him to run any risque in relation to such a market.

The question is not varied, by the circumstance of the Holland market being referred to in the contract. This did not confine the plaintiffs to that market, but they were at liberty to sell where they pleased; and still the question would be, were the teas of the best quality, and were they fitted for the Holland market? These questions could as well be settled at Copenhagen or Philadelphia, as at Amsterdam. This case certainly is not as strong, as that of insurance, in which, if a loss takes place, it is settled according to the prime cost and charges; although the understanding of the insurer is, that the goods shall go safely to the port of destination, and to indemnify the insured in case of loss. The cases stated by the plaintiffs' counsel, to prove the incorrectness of the rule laid down in this case, are entirely dissimilar from it. The case of general average, proceeds upon a principle entirely different. The claims for compensation by the person whose goods have been thrown overboard, for the safety of the residue of the cargo,

is a charge upon the cargo so saved; and consequently upon its value at the place of destination. The owner of the goods saved, ought not to gain, nor ought the owner of the goods thrown overboard to lose, by an act performed for the benefit of all; which would certainly happen, if the former received the full value of his goods, at the port of destination, and paid the loss according to the prime cost of the articles thrown overboard: for this reason, the whole cargo is valued at the price it would bring at the port of discharge, and the nett amount, after deducting charges, including also the nett value of the ship and freight, furnishes the sum which is subject to contribution. The other cases put by the counsel, are those of the carrier of goods, who, it is said, must pay the value of the goods at the place of destination, in case they are lost, or of a failure to deliver goods contracted to be delivered at a certain time and place; in which case the price of the articles at the time and at the place of delivery, is to be the rule of compensation.

Admit, for the sake of the argument, that the law, in relation to the carrier, is as the plaintiff's counsel contended for; still it differs from the present, in this essential circumstance; in that case, the delivery is to be made abroad, and in this it was to be made at Canton. If in both the supposed cases, the price is to be regulated, by the foreign market, where they were to be delivered, it would follow, that the teas in this case, should be referred to the value at Canton, where they were to be delivered.

But although the general rule is such as has been stated, still the question ought to be decided, according to the law, or usage at Canton, so far as we have any information respecting it; but no evidence has been given, directly upon this subject. In such a case, is it not fair, to consider Consequa's conduct, as evidence of the usage? It is reasonable to conclude, that no person can be more familiar with the usage at Canton, in relation to this subject, than a Hong merchant, who is in the constant habit of making contracts of this kind; and who, no doubt, has been frequently called upon, to settle claims for the breach of them. If in such cases, the usage at Canton be, to apply the rate of loss, ascertained by the sales at the foreign market, to the first cost; it is inconceivable, that Consequa would have waved the benefit of that rule, and settled as he did, the loss on the congo teas, part of the cargo of the Ganges, by paying the difference between the sales of those teas, and the average of the high priced congo teas, sold at the same time and place. Yet he did so, without objection, and voluntarily promised to settle the loss upon the cargo of the Asia, by the same rule. It is certainly possible, that this conduct might proceed from an excess of liberality, or from ignorance, but neither is probable.

If this supposition, however, be well founded, and the law at Canton, be similar to what I take to be the general law, then, the waving of a legal right, by Consequa, in one case, cannot bind him in any other case; whatever

promises he may have made on the subject. But if the jury should consider his conduct, as evidence of the law, and usage at Canton; then it is obligatory upon him, and they ought to decide accordingly. It may be proper to observe, that the usage which has been proved, of returning a box of tea which has been imposed upon the purchaser, in violation of the contract, and recovering two boxes of good tea, in lieu of it, seems strongly to countenance the presumption, that a higher rate of compensation is allowed, than would result from the application of the general rule, laid down in the case of Gilpins v. Consequa [Case No. 5,-452].

As to interest upon the claims of the plaintiffs, I can only repeat, what the court stated, in the case just mentioned; that it is generally, in the discretion of the jury, to give interest in the name of damages; although it is not conformable to legal principles, to allow it on unliquidated and contested claims, sounding in damages.

The jury found verdicts favourable to the plaintiffs' claims in all the cases, from which resulted a balance of five thousand dollars, upon the whole account against Willings and Francis.

[NOTE. New trials were ordered in these cases at the April term, 1816. Case No. 3,128. For a report of the proceedings on the new trial, see Id. 17,767.]